**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GERRY GABEL, derivatively on behalf of VERIZON COMMUNICATIONS INC., | Case No.: |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| HANS VESTBERG, MATTHEW ELLIS, CLARENCE OTIS, JR., SHELLYE L. ARCHAMBEAU, ROXANNE S. AUSTIN, MARK T. BERTOLINI, VITTORIO COLAO, MELANIE L. HEALEY, LAXMAN NARASIMHAN, DANIEL H. SCHULMAN, RODNEY E. SLATER, CAROL B. TOMÉ, GREGORY G. WEAVER, LOWELL C. MCADAM, RICHARD CARRIÓN, FRANCES KEETH, and KATHRYN TESIJA, | |
| Defendants, | |
| and | |
| VERIZON COMMUNICATIONS INC., | |
| Nominal Defendant. | |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Gerry Gabel ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Verizon Communications Inc. ("Verizon" or the "Company") brings this Verified Shareholder Derivative Complaint against Hans Vestberg ("Vestberg"), Matthew Ellis ("Ellis"), Clarence Otis, Jr. ("Otis"), Shellye L. Archambeau ("Archambeau"), Roxanne S. Austin ("Austin"), Mark T. Bertolini ("Bertolini"), Vittorio Colao ("Colao"), Melanie L. Healey ("Healey"), Laxman Narasimhan ("Narasimhan"), Daniel H. Schulman ("Schulman"), Rodney E. Slater ("Slater"), Carol B. Tomé ("Tomé"), Gregory G. Weaver ("Weaver"),  Lowell C. McAdam ("McAdam"), Richard Carrión ("Carrión"), Frances Keeth ("Keeth"), and Kathryn Tesija ("Tesija") (collectively, the "Individual Defendants" and together with Verizon, "Defendants"), for and among other things, their breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of federal securities laws.

Plaintiff alleges the following based upon personal knowledge with respect to Plaintiff, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including among other things, a review of Verizon's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, transcripts of Verizon conference calls with financial analysts and investors, news reports, financial analyst reports, public filings filed in the putative securities class action *General Retirement System of the City of Detroit v. Verizon Communications Inc., et al*., Case No. 23-cv-05218 (D.N.J.) (the "Securities Class Action"), and other publicly available information about Verizon. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.       This is a shareholder derivative action brought on behalf of Verizon against certain officers and members of the Company's Board of Directors ("Board") for breaches of their fiduciary duties, violations of the federal securities laws, and other wrongdoing as set forth below.

2.       Verizon is a holding company that, through its subsidiaries, is one of the world's leading providers of communications, technology, information and entertainment products and services to consumers, businesses and government entities. With a global presence, it offers data, video and voice services and solutions on networks and platforms that are designed to meet customers' demand for mobility, reliable network connectivity, security and control.

3.        This shareholder derivative action stems from Verizon's long-standing decision to leave toxic cable wires buried in the ground throughout the country, which allowed these wires to contaminate ground water and pose potential health risks to those exposed to these wires.

4.       At all relevant times Verizon kept this policy quiet, concealing this practice from nearby residents as well as from investors in violation of its disclosure obligations and fiduciary duties.

5.       On or about July 9, 2023, *The Wall Street Journal* ("WSJ") published an article, "America is Wrapped in Miles of Toxic Lead Cables," which reported on Verizon's toxic wires and alerted the public that their health may be in jeopardy from Verizon's practices. The article noted that these health risks include "behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart, and reproductive problems in adults…"

6.      Soon after this WSJ article, Senator Edward J. Markey wrote a letter to Verizon demanding that: "The telecommunications companies responsible for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and public health effects[.]"

7.      Soon after the WSJ article and Senator Markey's letter, an Environmental Protection Agency ("EPA") conducted an investigation.

8.      Verizon is potentially exposed to hundreds of millions of dollars, if not billions, in potential damages and liability as a result of fines, penalties, remedial work, ongoing testing, the EPA investigation, other adverse government action, and the Securities Class Action.

9.      The Securities Class Action seeks to recover substantial damages for violations of securities laws attributable to these buried, toxic wires and their nondisclosure.

10.     Verizon filed several 10-Qs and 10-Ks with the SEC attesting to the accuracy of its financial statements, which are required to disclose any material changes to the Company's internal controls and to disclosure any fraud committed by the Company, its officers, or its directors. These attestations failed to disclose the potential risks and exposure that would arise from Verizon's policy to leave the toxic cables in the ground.

11.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the New York Stock Exchange ("NYSE"), the Individual Defendants had a duty to prevent the dissemination of inaccurate information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, present and future business prospects, as well

as a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC.

12.     Plaintiff did not make a demand prior to bringing this action because it would be futile. Verizon's directors are neither disinterested nor independent. In the absence of this action, Verizon will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims asserted herein under a federal question for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC and Sections 10(b) and 21D of the Exchange Act (15 U.S.C. §§ 78j(b), 78u-4(f))) and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District,

Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

18.    Plaintiff is, and has been at all relevant times, a shareholder of Verizon.

19.    Verizon is incorporated under the laws of the State of Delaware. Verizon's principal executive offices are located at 1095 Avenue of the Americas, New York, New York 10036. Verizon's stock trades on the NYSE under the ticker symbol "VZ."

20.    Defendant Vestberg has been Verizon's Chief Executive Officer ("CEO") since August 2018 and has served as a member of the Board since June 2018. Since March 2019, Defendant Vestberg has served as the Chairman of the Board. Defendant Vestberg is named as a defendant in the Securities Class Action. Defendant Vestberg's total compensation from Verizon was $19,832,750, $20,342,871, and $19,097,582 in 2022, 2021, and 2020, respectively.

21.    Defendant Ellis was Verizon's Chief Financial Officer ("CFO") from November 1, 2016 through May 1, 2023. Defendant Ellis is named as a defendant in the Securities Class Action. Defendant Ellis's total compensation from Verizon was $9,379,303, $9,111,889, and $8,826,268 in 2022, 2021, and 2020, respectively.

22.    Defendant Otis has served as a member of Verizon's Board since 2006. Defendant Otis is a member of the Audit Committee, the Finance Committee, and the Human Resources Committee. Defendant Otis's total compensation from Verizon was $370,000, $370,000, and $394,000 in 2022, 2021, and 2020, respectively.

23.    Defendant Archambeau has served as a member of Verizon's Board since 2013. Defendant Archambeau is Chair of the Corporate Governance and Policy Committee and a

member of the Audit Committee. Defendant Archambeau's total compensation from Verizon was $328,000, $336,000, and $356,000 in 2022, 2021, and 2020, respectively.

24.     Defendant Austin has served as a member of Verizon's Board since 2020. Defendant Austin is a member of the Audit Committee and the Finance Committee. Defendant Austin's total compensation from Verizon was $316,000, $320,000, and $256,720 in 2022, 2021, and 2020, respectively.

25.     Defendant Bertolini has served as a member of Verizon's Board since 2015. Defendant Bertolini is Chair of the Finance Committee and a member of the Human Resources Committee. Defendant Bertolini's total compensation from Verizon was $332,000, $332,000, and $354,000 in 2022, 2021, and 2020, respectively.

26.     Defendant Colao has served as a member of Verizon's Board since 2022 and previously served on the Board between 2019 and 2021. Defendant Colao is a member of the Corporate Governance and Policy Committee and the Finance Committee. Defendant Colao's total compensation from Verizon was $50,000, $33,250, and $334,000 in 2022, 2021, and 2020, respectively.

27.     Defendant Healey has served as a member of Verizon's Board since 2011. Defendant Healey is a member of the Corporate Governance and Policy Committee and the Human Resources Committee. Defendant Healey's total compensation from Verizon was $302,000, $308,000, and $329,000 in 2022, 2021, and 2020, respectively.

28.     Defendant Schulman has served as a member of Verizon's Board since 2018. Defendant Schulman is Chair of the Human Resources Committee. Defendant Schulman's total compensation from Verizon was $334,000, $336,000, and $356,000 in 2022, 2021, and 2020, respectively.

29.     Defendant Narasimhan has served as a member of Verizon's Board since 2021. Defendant Narasimhan is a member of the Audit Committee and the Corporate Governance and Policy Committee. Defendant Narasimhan's total compensation from Verizon was $310,000, $318,870, and $356,000 in 2022, 2021, and 2020, respectively.

30.     Defendant Slater has served as a member of Verizon's Board since 2010. Defendant Slater is a member of the Corporate Governance and Policy Committee and the Human Resources Committee. Defendant Slater's total compensation from Verizon was $304,000, $308,000, and $328,000 in 2022, 2021, and 2020, respectively.

31.     Defendant Tomé served as a member of Verizon's Board from January 1, 2020 until March 12, 2020 and was elected to the Board in 2021.  Defendant Tomé is a member of the Finance Committee. Defendant Tomé's total compensation from Verizon was $306,000, $102,000, and $395,400 in 2022, 2021, and 2020, respectively.

32.     Defendant Weaver has served as a member of Verizon's Board since 2015. Defendant Weaver is Chair of Audit Committee and a member of the Finance Committee. Defendant Weaver's total compensation from Verizon was $350,000, $350,000, and $374,000 in 2022, 2021, and 2020, respectively.

33.     Defendant McAdam served as a member of Verizon's Board from March 4, 2011 until his term expired effective May 2019.

34.     Defendant Carrión served as a member of Verizon's board from 1995 until his term expired effective May 2, 2019.

35.     Defendant Keeth served as a member of Verizon's Board from 2006 until her term expired effective May 2, 2019.

36. Defendant Tesija served as a member of Verizon's Board from 2012 until her term expired effective May 7, 2020.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

37. As officers, directors, and/or fiduciaries of Verizon and because of their ability to control the business and corporate affairs of Verizon, the Individual Defendants owed Verizon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost efforts to control and manage Verizon in a fair, just, open, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Verizon and its shareholders so as to benefit all shareholders equally.

38. Each controlling shareholder, director and officer of the Company owes to Verizon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

39. The Individual Defendants, due to their positions of control and authority as directors and/or officers of Verizon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40. To discharge their duties, the officers and directors of Verizon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence to the Company and to its shareholders. The conduct of the Individual Defendants

complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Verizon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

43.     As senior executive officers and directors of a publicly-traded company, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC and all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

44.     To discharge their duties, the officers and directors of Verizon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Verizon were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner so as to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(b)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with laws and regulations and pursuant to Verizon's own Code of Conduct;

(c)    remain informed as to how Verizon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Verizon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement a functioning system of internal legal, financial, and management controls, such that Verizon's operations would adequately comply with all applicable laws and Verizon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

45.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Verizon and were acting within the course and scope of such agency.

46.     Because of their advisory, executive, managerial, and directorial positions with Verizon, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

47.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Verizon.

## THE COMPANY'S CODE OF CONDUCT

48.     Verizon has a Code of Conduct that applies to the Company's officers and directors.

49.     The Code of Conduct has a section titled "A safe and healthy workplace" that states in part:

> We share a responsibility for maintaining a safe and healthy workplace and for doing business in a way that meets our responsibilities to each other, our customers, and the public.
>
> **Workplace safety and environment**
>
> We are committed to providing a safe workplace and to meeting our environmental responsibilities. We have implemented an environmental, health, and safety (EHS) management system, and provide the resources and governance needed to meet our commitments and continuously improve performance. That means that each of us must perform our jobs in a safe and environmentally responsible manner and in compliance with Verizon programs and the law. Supervisors must ensure that direct reports are trained in the safety and environmental practices of their jobs, report potential noncompliance, and investigate all EHS concerns of which they become aware.
>
> You must report a work-related crash or injury; a hazard or incident; or a violation of an environmental, health, or safety law or company policy to your Supervisor or the EHS hotline at 800-386-9639. You should also contact the EHS hotline if you need advice on EHS compliance, a regulator visits your worksite or asks to schedule an inspection, or you believe an unsafe condition or environmental issue is not being properly addressed.

50.    The Code of Conduct has a section titled "Protecting Verizon's assets and reputation" that states in part:

**Preparing, disclosing, and maintaining accurate records**

We are committed to maintaining and providing truthful information that satisfies all legal requirements. We do not tolerate the falsification or improper alteration of records.

You must create and maintain true and accurate records. If you identify any mistakes or discrepancies, no matter how small, you must try to resolve them immediately, and you must promptly notify your supervisor.
You may never direct anyone to create or approve a false or misleading record, or intentionally take any action that helps to create a false or misleading record, such as withholding information from someone preparing a record.
Company records must be retained according to applicable laws and Verizon's Records Management Policy. You may never destroy, alter, or conceal any record if you have been directed to retain it or if you know – or reasonably believe there is a possibility – of any litigation or any internal or external investigation concerning that record.

If you believe a record was intentionally falsified or created to be misleading, or if anyone directed you to violate any section of this policy, you must immediately contact Verizon Ethics.

**Promoting transparent and complete disclosure**
 Our investors and shareholders are key to our success and we are committed to transparency in financial reporting. All disclosures made in financial reports and in public communications must be full, fair, accurate, and understandable.

You may not selectively disclose (even in one-on-one or small meetings) any material information regarding the company. You should be particularly careful not to disclose such information if you make presentations to customers, business providers, investors, or other third parties.

We use auditors to ensure the accuracy of our reporting. You must cooperate with auditors and provide them with complete, accurate, and timely information, and you must never improperly influence or mislead any auditor.

## <u>ADDITIONAL DUTIES OF THE AUDIT COMMITTEE</u>

51.    Verizon's Audit Committee maintains a charter that outlines the duties and responsibilities of its members. According to the Audit Committee Charter, the purpose of the Audit Committee is:

to assist the Board of Directors in its oversight of: (1) the integrity of the Corporation's accounting and financial reporting and its systems of internal controls, (2) the performance and qualifications of the independent registered public accounting firm (including the independent registered public accounting firm's independence), (3) the performance of the Corporation's internal audit function, and (4) the Corporation's compliance with legal and regulatory requirements. Consistent with this oversight function, the Committee shall have the authority to conduct investigations into any matters within the Committee's responsibilities and, in doing so, have full access to the Corporation's records, employees, and independent registered public accounting firm (with or without the presence of management). The Committee shall have the authority, to the extent it deems necessary or appropriate, to retain, utilize and rely on legal, accounting or other advisors for advice and assistance. The Corporation shall pay the costs of any such advisors retained by the Committee.

52.    The Audit Committee's duties regarding risk management and control include:

1. Assess and discuss with management the Corporation's significant business risk exposures (including those related to cybersecurity, data privacy and data security) and management's program to monitor, assess and manage such exposures, including the Corporation's risk assessment and risk management policies.

2. Assess the adequacy of the Corporation's overall control environment, including controls in selected areas representing financial reporting, disclosure, compliance, and significant financial or business risk.

3. Review reports from the CEO and CFO on any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal controls.

4. Assess the annual scope and plans of the independent and internal auditors.

5. Report to the Board of Directors on the activities of the Corporation's Management Audit Committee.

53.    The Audit Committee's duties regarding financial reporting and disclosure

matters include:

6. Review and discuss with management and the independent auditor the annual audited financial statements, related footnotes, disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and the opinion of the independent auditor with respect to the financial statements.

7. Review and discuss with management and the independent auditor the quarterly financial statements, related footnotes, disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and the results of the independent auditor's quarterly review of the financial statements.

8. Review and discuss with management and the independent auditor any significant events, transactions, changes in accounting estimates, changes in important accounting principles and their application, any major issues as to the adequacy of internal controls and any special audit steps adopted in light of material control deficiencies.  The Committee Chair may represent the entire Committee for this purpose.

9. Review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods, as well as off-balance sheet structures, on the financial statements.

10. Review, in conjunction with the Committee's review of the quarterly and annual reports, the process for the CEO and CFO certifications with respect to the financial statements and the Corporation's disclosure and internal controls.

11. Review reports from the CEO and CFO on all significant deficiencies in the design or operation of internal controls which could adversely affect the Corporation's ability to record, process, summarize, and report financial data.

12. Review and discuss with management the public release of earnings information, as well as financial information and earnings guidance provided to analysts and rating agencies and delegate to the Committee Chair the authority, at the Chair's discretion, to review any such release, information and guidance.

13. Recommend to the Board of Directors whether the annual audited financial statements should be included in the Corporation's annual report on Form 10-K.

54.    The Audit Committee's duties regarding Verizon's internal audit oversight

include:

14. Review reports from the Internal Audit department on the proposed scope of the audit plan and the process to develop the plan, as well as the program for integration of the independent and internal audit efforts.

15. Review reports from the Internal Audit department on the status of significant findings and recommendations and management's responses to such findings and recommendations.

16. Review the charter, reporting relationship, responsibilities, activities, organizational structure, qualifications and resources of the Internal Audit department and assess the department's performance.

55.    The Audit Committee's duties regarding ethical, legal and regulatory compliance

matters include:

28. Assess the design, implementation and effectiveness of the Corporation's compliance processes and programs, including the Code of Conduct.

14

29. Review with management, the independent auditor and the General Counsel, as appropriate, any legal, regulatory or compliance matters that may have a material impact on the Corporation's financial statements or compliance policies, including any correspondence with or other action by regulators or governmental agencies.

30. Assess the Corporation's policies and procedures with respect to Executive Officers' expense accounts and perquisites, including their use of corporate assets and the reporting of those items (taking into consideration the results of any review of these areas by the internal auditors).

31. Assess the Committee's procedures for (a) the receipt, retention, and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (b) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

32. Review reports and disclosures of significant conflicts of interest and related person transactions.

56. In violation of the Audit Committee Charter, Defendants Archambeau, Austin, Narasimhan, Otis, and Weaver, who all served on the Audit Committee, failed to: adequately review and discuss the Company's annual and quarterly earnings press releases and SEC filings as well as proxy statements; exercise their risk management and risk assessment functions; and ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

57. On February 15, 2019, Verizon filed its annual report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K"). Defendants Vestberg, Ellis, McAdam, Archambeau, Bertolini, Carrión, Healey, Keeth, Otis, Schulman, Slater, Tesija, and Weaver signed, or authorized their signature on, the 2018 10-K. Attached to the 2018 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to Verizon's internal control over financial reporting and the disclosure of all fraud.

58.     The 2018 10-K contained the following statements regarding the Company's copper cable network infrastructure:

> ***To compensate for the shrinking market for traditional copper-based products (such as voice services), we continue to build our Wireline business around a fiber-based network supporting data, video and advanced business services -*** *areas where demand for reliable high- speed connections is growing.* ***We continue to seek ways to increase revenue, further realize operating and capital efficiencies and maximize profitability across the segment. We are reinventing our network architecture around a common fiber platform that will support both our wireless and wireline businesses. We expect our "multi-use fiber" Intelligent Edge Network initiative will create opportunities to generate revenue from fiber-based services in our Wireline business***

> \*     \*     \*

> Consumer Markets provides residential fixed connectivity solutions, including Internet, TV and voice services. We provide these services over our 100% fiber-optic network under the brand "Fios" and ***over a traditional copper-based network to customers who are not served by Fios.*** In 2018, Consumer Markets revenues were $12.6 billion, representing approximately 42% of Wireline's aggregate revenues.

> \*     \*     \*

> *Voice services.* ***We offer voice services on our fiber and copper networks, providing local, long distance, and calling features***

> \*     \*     \*

> *Core services.* Core services include core voice and data services, which consist of a comprehensive portfolio of domestic and global solutions utilizing traditional telecommunications technology. Voice services include local exchange, regional, long distance and toll-free calling along with voice messaging services, conferencing and contact center solutions. Core data includes private line and data access networks. Core services also include the provision of customer premises equipment, and installation, maintenance and site services. ***We continue to transition customers out of copper-based legacy voice and data services to fiber services, including IP and Ethernet.***[1]

59.     On February 4, 2020, Verizon issued an Environmental, Health and Safety Policy (the "EHS Policy"), which stated in relevant part:

> Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our

---

[1] Unless otherwise noted, all emphasis added.

commitment goes beyond maintaining compliance with laws, regulations and policies. Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareholders, and society.

Verizon will conduct business in an environmentally and socially responsible manner and provide employees with a safe and healthful workplace. We are committed through our environmental, health and safety (EHS) management system and supporting programs to eliminate hazards and reduce EHS risks.

Verizon will provide the resources needed to meet our corporate commitments, fulfill our compliance obligations, and foster a culture of continual EHS improvement.

Verizon employees and everyone who conducts business on our behalf must perform their jobs in a safe and environmentally responsible manner and must comply with all laws, regulatory requirements, and company programs for protecting the environment and human health and safety. Verizon will seek employees participation and consultation to identify concerns and opportunities for improvement.

Verizon will provide our customers with solutions—through our products and services—which help them improve safety performance, reduce environmental impact, and support our nation's transition to a sustainable, low-carbon economy.

All Verizon employees and those who conduct business on behalf of Verizon are responsible for following his policy. The Environmental, Health and Safety organization is responsible for providing direction and support. For more information about the scope and organization of Verizon's environmental, health and safety management system, please direct inquiries to askEHS@oneverizon.com.

60.    The EHS Policy contained statements that were materially false and misleading because at the time Verizon published the EHS Policy, it was responsible for lead cables harming and posing a risk of further harm to the environment, Verizon employees, and to the public. These misleading statements include:

- "Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate[]"

- "Our commitment goes beyond maintaining compliance with laws, regulations and policies. Verizon's overarching sustainability mission is to use and promote

sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareowners, and society,"

61.     On February 21, 2020, Verizon filed its annual report on Form 10-K for the year ended December 31, 2019 (the "2019 10-K"). Defendants Vestberg, Ellis, Archambeau, Bertolini, Colao, Healey, Otis, Schulman, Slater, Tesija, Tomé, and Weaver signed, or authorized their signature on, the 2019 10-K. Attached to the 2019 10-K were SOX certifications signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to Verizon's internal control over financial reporting and the disclosure of all fraud.

62.     The 2019 10-K discussed Verizon's copper cable network infrastructure, stating in part:

Our wireless services are provided across one of the most extensive wireless networks in the United States (U.S.) under the Verizon brand and through wholesale and other arrangements. ***Our wireline services are provided in nine states in the Mid-Atlantic and Northeastern U.S., as well as Washington D.C., over our 100% fiber-optic network under the Fios brand and over a traditional copper-based network to customers who are not served by Fios.*** In 2019, the Consumer segment's revenues were $91.1 billion, representing approximately 69% of Verizon's consolidated revenues. As of December 31, 2019, Consumer had approximately 95 million wireless retail connections, 6 million broadband connections and 4 million Fios video connections

\*     \*     \*

*Residential Fixed Services.* We provide residential fixed connectivity solutions to customers over our 100% fiber-optic network under the Fios brand, and ***over a traditional copper-based network to customers who are not served by Fios.*** During 2018, we commercially launched fifth-generation (5G) wireless technology for the home (5G Home) on proprietary standards in four U.S. markets and on global standards in a fifth market in 2019.

We offer residential fixed services tailored to the needs of our customers. Depending on those needs at a particular time, our services may include features related to, among other things: Internet access at different speed tiers using

fiber-optic, ***copper or wireless technology;*** video services that may feature a variety of channel options, video on demand products, cloud-based services and digital video recording capabilities; over-the-top video services; and voice services.

63.     On February 25, 2021, Verizon filed its 2020 annual report on Form 10-K for the year ended December 31, 2020 (the "2020 10-K"). Defendants Vestberg, Ellis, Archambeau, Austin, Bertolini, Healey, Otis, Schulman, Slater, and Weaver signed, or authorized their signature on, the 2020 10-K. Attached to the 2020 10-K were SOX certifications signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to Verizon's internal control over financial reporting and the disclosure of all fraud.

64.     The 2020 10-K discussed Verizon's environmental impact, stating in part:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world. During 2020, we focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

65.     The 2020 10-K discussed Verizon's employees' and worker safety, stating in part:

> In 2020, Verizon employees across the Company came together in new ways in response to the health and humanitarian crisis brought on by the novel coronavirus (COVID-19) pandemic. Soon after COVID-19 was first identified, Verizon took many broad-ranging steps to support our employees and their families so that the Company could continue providing our essential services to our customers and communities…limiting our customer-focused field

operations for a period of time; ***enhancing safety protocols for employees working outside their homes;*** launching a COVID-19 leave of absence policy and expanded family care assistance for employees; and providing additional compensation to employees in front line roles that could not be done from home for a period of time.

66.     On March 29, 2021, Verizon filed its proxy statement for 2021 with the SEC (the "2021 Proxy Statement"). The 2021 Proxy Statement included a message signed by Defendants Vestberg and Otis that discussed employee safety and Verizon's impact on the environment, stating in part:

> ***And of course the safety and well-being of our employees***, especially those on the front lines serving our customers in their homes, businesses and in our retail stores, ***remains our top priority***. We could not be more proud of their efforts during these unprecedented times.
>
> Finally, as we head towards a new normal, our Board knows that our company has a vital role to play in addressing the economic and social challenges ahead of us, including climate change, digital inclusion, criminal justice reform, and the future of work. Last summer, Verizon announced Citizen Verizon, our plan for economic, environmental and social advancement. Through Citizen Verizon, we take responsibility for our shared future through a number of public commitments, including commitments to promote digital inclusion by providing ten million youths with digital skills training by 2030, contribute to climate protection by becoming carbon neutral in our operations by 2035, and foster human prosperity by preparing 500,000 individuals for jobs of the future by 2030.

67.     The 2021 Proxy Statement discussed Verizon's focus on the environment, stating in part:

> **Oversight of Environmental, Social and Governance Strategy and Risks**
>
> ***Our Board recognizes that operating responsibly – minimizing the environmental impact of our operations***, protecting the privacy of our customers' information and respecting human rights by creating an environment of respect, integrity and fairness for our employees and customers wherever we do business – ***is fundamental to the long-term success of our Company***. The Corporate Governance and Policy Committee oversees corporate responsibility and sustainability. Verizon has a Chief ESG Officer dedicated to enhancing the Company's sustainability reporting and stakeholder engagement on environmental, social and governance issues that align with Verizon's core business strategy. The Chief ESG Officer heads a cross-functional team that focuses on strategic areas including governance, reporting, human rights,

environmental sustainability and digital trust and safety and also oversees Verizon's efforts to deliver on its ESG commitments. The Chief ESG Officer regularly provides the Corporate Governance and Policy Committee with updates on the Company's ESG priorities, commitments and reporting.

**Environmental Sustainability and Climate.** *To address climate-related risks, Verizon is taking steps to make our networks more climate resilient, minimize our environmental footprint, and develop solutions that enable our customers to minimize their environmental footprints*. We are supporting the transition to a greener grid by making substantial investments in renewable energy. The Company has set ambitious goals to source or generate renewable energy equivalent to 50% of our total annual electricity consumption by 2025 and to be carbon neutral in our operations (Scope 1 and 2) by 2035. Each committee of the Board oversees the management of the specific risks related to our environmental sustainability strategy and the transition to a low carbon economy that fall under the committee's area of responsibility:

- **Audit Committee:** Environmental and climate-related risks discussed during annual business risk reviews with the Audit Committee include operational and financial risks relating to energy management and our renewable energy and carbon neutral commitments, maintaining network reliability during catastrophic and weather-related events, and possible laws or regulations that seek to mitigate climate change.

- **Corporate Governance and Policy Committee:** At least annually the Chief ESG Officer briefs the Corporate Governance and Policy Committee on Verizon's progress on meeting our environmental sustainability commitments.

- **Finance Committee:** The Finance Committee oversees the strategy for managing risks related to Verizon's renewable energy exposure through renewable energy purchase agreements, as well as the Company's green financing strategy.

- **Human Resources Committee:** To motivate management to be good stewards of our planet and reduce the environmental impact of our operations, the Human Resources Committee has included a carbon intensity reduction target as one of the performance measures in the Short-Term Incentive Plan (Short-Term Plan) since 2014.

68.     The 2021 Proxy Statement was false and misleading as it omitted the known damage caused by the legacy copper cables Verizon abandoned as they were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Verizon employees, and the public.

69.     On April 27, 2021, July 28, 2021, and October 26, 2021, Verizon filed quarterly reports on Form 10-Q for the periods ended March 31, 2021, June 30, 2021, and September 30, 2021, respectively (collectively, the "2021 10-Qs"). Attached to each of the 2021 10-Qs were SOX certifications signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to Verizon internal control over financial reporting and the disclosure of all fraud.

70.     Each of the 2021 10-Qs discussed the Company's environmental impact, stating in part:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world. In 2021, we are focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

71.     The 2021 10-Qs discussed Verizon's changes in its technologies, stating in part:

> We are consistently deploying new network architecture and technologies to secure our leadership in both fourth-generation (4G) and fifth-generation (5G) wireless networks.

> \*       \*       \*

> **Capital Expenditures and Investments**
> We continue to invest in our wireless networks, high-speed fiber and other advanced technologies to position ourselves at the center of growth trends for the future.

72.     On February 11, 2022, Verizon filed its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"). Defendants Vestberg, Ellis, Archambeau, Austin, Bertolini, Healey, Otis, Narasimhan, Schulman, Slater, Tomé, and Weaver signed, or authorized their signature on, the 2021 10-K. Attached to the 2021 10-K were SOX certifications signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to Verizon's internal control over financial reporting and the disclosure of all fraud.

73.     The 2021 10-K discussed Verizon's environmental impact, stating in part:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world. During 2021, we focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

74.     On March 28, 2022, Verizon filed its proxy statement for 2022 with the SEC (the "2022 Proxy Statement"). The 2022 Proxy Statement discussed employee health and safety, stating in part:

> **Employee health and safety.** ***Verizon is committed to maintaining a safe workplace and environmentally responsible work practices, and we expect our suppliers to share that commitment***. At least annually, the Chief Human Resources Officer briefs the Human Resources Committee on the Company's health and safety protocols, incidents involving employees and suppliers, and actions that management is taking to limit these risks.

23

75.    The 2022 Proxy Statement discussed Verizon's commitment to the environment,

stating in part:

> ***Our Board recognizes that operating responsibly – minimizing the environmental impact of our operations***, protecting the privacy of our customers' information and respecting human rights by creating an environment of respect, integrity and fairness for our employees and customers wherever we do business – ***is fundamental to the long-term success of our Company.*** The Corporate Governance and Policy Committee oversees corporate responsibility and sustainability. Verizon has a Chief ESG Officer dedicated to enhancing the Company's sustainability reporting and stakeholder engagement on environmental, social and governance issues that align with Verizon's core business strategy. The Chief ESG Officer heads a cross-functional team that focuses on strategic areas including governance, reporting, human rights, environmental sustainability and digital trust and safety and also oversees Verizon's efforts to deliver on its ESG commitments. The Chief ESG Officer regularly provides the Corporate Governance and Policy Committee with updates on the Company's ESG priorities, commitments and reporting.

> **Environmental sustainability and climate.** ***To address climate-related risks, Verizon is upgrading and hardening our infrastructure to be prepared for a changing climate, improving energy efficiency across our networks and facilities, making substantial investments in renewable energy and developing solutions to help our customers to reduce their carbon footprints***. We have announced science-based emissions reduction targets for our Scope 1, 2 and 3 emissions and have set ambitious goals to source or generate renewable energy equivalent to 50% of our total annual electricity consumption by 2025 and to achieve net zero operational emissions (Scope 1 and 2) by 2035. The Executive Climate Oversight Committee, composed of Verizon's Chief Financial, Chief Administrative, Chief ESG and Chief Sustainability Officers, monitors Verizon's progress on these initiatives and commitments and recommends changes or enhancements to our climate strategy. Representatives from the Strategy, Network, Fleet, Global Real Estate, Treasury, Sustainability and ESG organizations report to the committee on climate-related issues and initiatives that fall within their responsibilities. The Chief ESG Officer periodically updates the Corporate Governance and Policy Committee on the issues considered by the committee, the Company's progress in meeting its climate-related commitments, and any significant developments relating to the Company's strategy for managing climate-related risks.

> Each committee of the Board oversees the management of the specific risks related to our environmental sustainability strategy and the transition to a low carbon economy that fall under the committee's area of responsibility:

> •    **Audit Committee:** Environmental and climate-related risks discussed during

annual business risk reviews with the Audit Committee include operational and financial risks relating to energy management and our renewable energy and carbon neutral commitments, maintaining network reliability during catastrophic and weather-related events, and the impacts of possible laws or regulations that seek to mitigate climate change.

- **Corporate Governance and Policy Committee:** The Corporate Governance and Policy Committee oversees Verizon's progress on meeting our environmental sustainability commitments.

- **Finance Committee:** The Finance Committee oversees the strategy for managing risks related to Verizon's renewable energy exposure through renewable energy purchase agreements, as well as the Company's green financing strategy.

- **Human Resources Committee:** To motivate management to be good stewards of our planet and reduce the environmental impact of our operations, the Human Resources Committee has included a carbon intensity reduction target as one of the performance measures in the Short-Term Incentive Plan (Short-Term Plan) since 2014.

76.    On April 27, 2022, July 28, 2022, and October 25, 2022, Verizon filed its quarterly reports on Form 10-Q for the periods ended March 31, 2022, June 30, 2022, and September 30, 2022, respectively (collectively, the "2022 10-Qs"). Attached to each of the 2022 10-Qs were SOX certifications signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to Verizon's internal control over financial reporting and the disclosure of all fraud.

77.    Each of the 2022 10-Qs discussed Verizon's environmental impact, stating in part:

In 2022, we are focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in

the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities.

78.    The 2021 10-Qs discussed Verizon's changes in its technologies, stating in part:

We are consistently deploying new network architecture and technologies to secure our leadership in both fourth-generation (4G) and fifth-generation (5G) wireless networks.

*    *    *

**Capital Expenditures and Investments**

We continue to invest in our wireless networks, high-speed fiber and other advanced technologies to position ourselves at the center of growth trends for the future.

79.    These statements were materially false and misleading because, at the time they were made, many of the legacy copper cables Verizon abandoned were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Verizon employees, and the public.

80.    In 2022, the Company posted on its website its 2021 Environmental, Social and Governance Report for the 2021 calendar year (the "2021 ESG Report"). The 2021 ESG Report discussed Verizon's disposal of waste, stating in part:

*Verizon's recycling practices exceed regulatory mandates*. We engage e-waste vendors that manage our waste in accordance with high industry standards for environmental stewardship such as R2 or e- Stewards. *Our practice is to require lead-acid batteries from our U.S. operations to be sent to Verizon-approved recycling facilities in the U.S. or Canada and to require vendors to provide certificates of recycling for the batteries.* We regularly audit facilities, including battery smelters, that manage Verizon's hazardous or regulated waste.

81.    On February 10, 2023, Verizon filed its annual report on Form 10-K for the year ended December 31, 2022 (the "2022 10-K"). Defendants Vestberg, Ellis, Archambeau, Austin, Bertolini, Colao, Healey, Narasimhan, Otis, Schulman, Slater, Tomé, and Weaver signed, or authorized their signature on, the 2022 10-K. Attached to the 2022 10-K were SOX

certifications signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to Verizon's internal control over financial reporting and the disclosure of all fraud.

82.    The 2022 10-K discussed the Company's exposure to litigation, stating in part:

**We are subject to a substantial amount of litigation, which could require us to pay significant damages or settlements.**

We are subject to a substantial amount of litigation and claims in arbitration, including, but not limited to, shareholder derivative suits, patent infringement lawsuits, wage and hour class actions, contract and commercial claims, ***personal injury claims, property claims, environmental claims,*** and lawsuits relating to our advertising, sales, billing and collection practices. ***In addition, our wireless business also faces personal injury and wrongful death lawsuits relating to alleged health effects of wireless phones or radio frequency transmitters.*** We may incur significant expenses in defending these lawsuits. In addition, we may be required to pay significant awards or settlements.

83.    The 2022 10-K discussed the Company's business value, stating in part:

In 2022, we focused on maintaining our network leadership, including by rapidly deploying C-Band spectrum; retaining and growing our high-quality customer base while balancing profitability in challenging market conditions; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning the trust of our stakeholders, limiting our environmental impact and supporting our customer base growth while creating social benefit through our products and services.***

84.    In 2023, Verizon released on its website its Environmental, Social and Governance Report for the 2022 calendar year (the "2022 ESG Report"). The 2022 ESG Report contained the following statement regarding Verizon's purported efforts to reduce waste, and on responsibly disposing of potentially hazardous waste, such as lead-acid batteries:

**E-waste: reducing, reusing and recycling**

Verizon defines electronic waste, ore-waste, as electronic products and component parts that are at the end of their useful life and/or have been returned by customers. E-waste generated by our business operations includes cell phones, chargers, set-top boxes, network equipment, batteries and associated plastic components. ***In 2022, Verizon reused or recycled approximately 43.4 million pounds of e-waste, including 1.6 million pounds of plastic and 2.7***

***million pounds of lead-acid batteries…***Many of Verizon's recycling practices exceed regulatory mandates. We engage e-waste vendors that manage our waste in accordance with high industry standards for environmental stewardship such as R2 and e-Stewards. ***Our practice is to require lead- acid batteries from our U.S. operations to be sent to Verizon-approved recycling facilities in the U.S. or Canada and to require our vendors to provide certificates of recycling for the batteries. We regularly audit facilities, including battery smelters, that manage Verizon's hazardous or regulated waste.***

85.    On March 27, 2023, Verizon filed its proxy statement for 2023 with the SEC (the

"2023 Proxy Statement"). The 2023 Proxy Statement discussed the health and safety of

Verizon's employees, stating in part:

**Employee health and safety.** ***Verizon is committed to maintaining a safe workplace and environmentally responsible work practices***, and we expect our suppliers to share that commitment. At least annually, the Chief Human Resources Officer briefs the Human Resources Committee on the Company's health and safety protocols, incidents involving employees and suppliers, and actions that management is taking to limit these risks.

86.    The 2023 Proxy Statement discussed Verizon's commitment to the environment,

stating in part:

**Oversight of ESG strategy and risks**

***Our Board recognizes that operating responsibly and appropriately managing the environmental and social risks arising from our operations are fundamental to the long-term success of our Company***. The Corporate Governance and Policy Committee oversees corporate responsibility, public policy and sustainability. Verizon has a centralized ESG team that is dedicated to enhancing the Company's sustainability reporting and stakeholder engagement on environmental, social and governance issues that align with Verizon's core business strategy. This cross-functional team focuses on strategic areas including governance, reporting, human rights and environmental sustainability and also oversees Verizon's efforts to deliver on its ESG commitments. The Senior Vice President, Deputy General Counsel and Corporate Secretary regularly provides the Corporate Governance and Policy Committee with updates on the Company's ESG priorities, commitments, stakeholder engagement and reporting. In addition, the ESG team partners with the Enterprise Risk Management team to bolster Verizon's controls framework that collects, manages and reports on the information required for all of its ESG-related public disclosures.

**Environmental sustainability and climate.** Verizon has set long-term and interim targets to address current and future climate-related risks. Our long-term

28

goal is to achieve net-zero emissions in our operations by 2035. In support of this goal, we expect to source renewable energy equivalent to 50% of our annual electricity usage by 2025 and 100% by 2030. We also have a science-based target to reduce our operational emissions by 53% (over a 2019 baseline) by 2030. We are upgrading and hardening our infrastructure to be prepared for a changing climate, improving energy efficiency across our networks and facilities, making substantial investments in renewable energy and developing solutions to help our customers to reduce their carbon footprints. Several of our Directors have experience with climate-related issues, including renewable energy, network resilience, innovative technological solutions and emissions management.

Each committee of the Board oversees the management of the specific risks related to our environmental sustainability strategy and the transition to a low carbon economy that fall under the committee's area of responsibility:

- **Audit Committee:** Environmental and climate-related risks discussed during annual business risk reviews with the Audit Committee include operational and financial risks relating to energy management and our renewable energy and carbon neutral commitments, maintaining network reliability during catastrophic and weather-related events, and the impacts of possible laws or regulations that seek to mitigate climate change

87.     The 2023 Proxy Statement was false and misleading as it omitted the known damage caused by the legacy copper cables Verizon abandoned as they were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Verizon employees, and the public.

88.     On April 27, 2023, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2023 (the "1Q23 1-Q"). Attached to the 1Q23 10-Q were SOX certifications signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to Verizon's internal control over financial reporting and the disclosure of all fraud.

89.     The 1Q23 10-Q discussed the Company's business value, stating in relevant part:

To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2023, we are focused on maintaining the reliability and resilience of our network, retaining and growing our high-quality customer base while balancing profitability in challenging

market conditions, and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning the trust of our stakeholders, limiting our environmental impact and supporting our customer base growth while creating social benefit through our products and services.*** Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that our C-Band spectrum, together with our industry leading millimeter wave spectrum holding, fourth-generation (4G) LongTerm Evolution (LTE) network and fiber infrastructure, will drive innovative products and services and fuel our growth.

90.    The statements contained in ¶¶57-89 were materially false and misleading because they failed to disclose and materially mislead shareholders about key facts pertaining to Verizon's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants made, or caused Verizon to make, false and misleading statements and failed to disclose that: (1) Verizon had abandoned and was responsible for highly toxic cables which were wrapped in lead, a known neurotoxin, that harmed and posed the risk of further harming the environment, Verizon employees, and the general public; (2) Verizon's ownership of these cables, and failure to disclose their ownership of these cables to employees and the public likely to be harmed, constituted a threat to Verizon's reputation and its ability to create business value by earning the trust of its customers, employees, and shareholders; (3) Verizon faces potentially significant litigation risk, regulatory risk, and reputational harm as a result of its responsibility for these lead-covered cables and the health risks and environmental damage stemming from their presence around the country; (4) Verizon was warned about the damage and risks the lead-wrapped cables presented, but did not disclose the potential threat to Verizon's employees or to the general public; and (5) as a result, the Individual Defendants' statements about Verizon's

business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis in fact at all relevant times.

## The Truth Emerges

91.     One July 9, 2023, the WSJ published an article titled, "America is Wrapped in Miles of Toxic Lead Cables." This article discussed Verizon and other telecom companies who installed toxic cables, stating in part:

> ***Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.***
>
> The lead can be found on the banks of the Mississippi River in Louisiana, the Detroit River in Michigan, the Willamette River in Oregon and the Passaic River in New Jersey, according to the Journal's tests of samples from nearly 130 underwater-cable sites, conducted by several independent laboratories. The metal has tainted the soil at a popular fishing spot in New Iberia, La., at a playground in Wappingers Falls, N.Y., and in front of a school in suburban New Jersey.
>
> The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination—more than 2,000 lead-covered cables—that hasn't been addressed by the companies or environmental regulators. These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.
>
> ***Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency***. At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play. "We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.
>
> ***For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.***

Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Even without further exposure, lead can stay in the blood for about two or three months, and be stored in bones and organs longer. Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.

The Journal's findings "suggest there is a significant problem from these buried lead cables everywhere, and it's going to be everywhere and you're not even going to know where it is in a lot of places," said Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, a federal agency.

In Coal Center, Pa., medical tests independently sought by the mother of 6-year-old twins, Joyanna and Beau Bibby, and shared with the Journal, showed they had high levels of lead in their blood. The tests were taken a few days after they played in a lot next to their house under a drooping cable.

In response to the Journal's reporting… Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. They said they follow regulatory safety guidelines for workers dealing with lead.

The companies and an industry group representing them said they would work together to address any concerns related to lead-sheathed cables. "The U.S. telecommunications industry stands ready to engage constructively on this issue," said a spokeswoman for USTelecom, a broadband association that represents companies in the industry.

*     *     *

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

Some former telecom executives said companies believed it was safer at times to leave lead cables in place than remove them, given the lead that could be released in the process.

The lead-covered cable network included more than 1,750 underwater cables, according to public records collected by the Journal. A Journal analysis of the five most densely populated states, and more than a dozen of the most densely populated counties in the nation, identified about 250 aerial cables alongside

streets and fields next to schools and bus stops, some drooping under the weight. There are likely far more throughout the country.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. The samples were analyzed for lead content by Pace Analytical Services, an accredited environmental-testing lab. A researcher at the University of Washington who analyzed the chemical fingerprint of lead at some of those sites verified that the lead contaminating the water and soil likely originated from the cable.

**AMONG THE FINDINGS:**

*—Roughly 330 of the total number of underwater cable locations identified by the Journal are in a "source water protection area," designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal.*

—Aerial lead cabling runs alongside more than 100 schools with about 48,000 students in total. More than 1,000 schools and child-care centers sit within half a mile of an underwater lead cable, according to a Journal analysis using data from research firm MCH Strategic Data.

—In New Jersey alone, more than 350 bus stops are next to or beneath aerial lead-covered cables, a Journal analysis of NJ Transit data found.

—Roughly 80% of sediment samples taken next to underwater cables, which the Journal tested, showed elevated levels of lead. It isn't known if the level of leaching is constant; experts say old cables tend to degrade over time.

*Ben Grumbles, executive director of an association of state environmental regulators, called the Journal's findings disturbing. "This is a type of toxic exposure that isn't on the national radar and it needs to be," he said. "There is a need to act and clean it up."*

**AN ANCIENT NETWORK**

American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water. For underwater cables, steel cords sometimes surround the lead for further protection.

When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.

With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form

33

the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.

To track the underwater cables, the Journal collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables that were approved more than a century ago. Removing Army Corps-approved cables at any time would routinely require a permit or be noted in the original paperwork, officials say. The Journal tally of abandoned lead cables is sure to be an undercount.

Researchers Seth Jones and Monique Rydel Fortner, from the environmental consulting firm Marine Taxonomic Services, collected lead, soil and water samples at the Journal's request—a process that included diving expeditions at some locations. They have become experts in lead cables since they discovered them under Lake Tahoe more than 10 years ago and have advocated for their removal. The Environmental Defense Fund, a nonprofit advocacy group, provided guidance and $85,000 to MTS to partly fund its field research for the project.

The Journal found that where lead contamination was present, the amount measured in the soil was highest directly under or next to the cables, and dropped within a few feet—a sign the lead was coming from the cable, experts said.

The Journal didn't find lead in all the locations it tested. The level of contamination can vary in water and soil, depending on environmental and other factors. (See article describing the Journal's methodology.)

The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes. The EPA and other agencies have spent billions of dollars to reduce lead in the environment. In 1997, health regulators said average blood lead levels in children and adults had dropped more than 80% since the 1970s.

Yet large numbers of American children continue to show levels of lead in their blood—more than half of those tested, according to a Quest Diagnostics study published in 2021, based on an analysis of test results from more than one million children under age 6.

"A new, uncontrolled source of lead like old telephone cables may partly explain" why children continue to have lead in their blood, said Jack Caravanos, an environmental public-health professor at New York University, who assisted the Journal in its research. "We never knew about it so we never acted on it, unlike lead in paint and pipes."

Gordon Binkhorst, an environmental consultant and expert on lead sampling, said he believes cables should be removed because they are "continuing sources of soil and potentially groundwater contamination." Other experts said covering the cables and the area around them could reduce the risk.

Binkhorst reviewed the sampling methods used by the Journal and said they were appropriate techniques for basic testing of whether lead was present in the soil and water near the cables, using a certified environmental testing lab.

*       *       *

**NORTHERN EXPOSURE**

In Wappingers Falls, N.Y., about 60 miles north of New York City just off the Hudson River, an aerial lead cable hangs above the perimeter of a town playground, with a jungle gym, a swing set and a basketball court.

Near a "CHILDREN AT PLAY" sign, lead in the soil measured more than 1,000 parts per million, according to Caravanos, the NYU professor.

The EPA's recommendations for the levels of lead it believes are generally safe in soil are lower for areas where children play, at 400 parts per million, and higher for other areas, at 1,200 parts per million. (While lead in water is described in parts per billion, lead in soil is described in parts per million, with one part per million equivalent to about one inch in 16 miles.)

Caravanos used an X-ray fluorescence analyzer, or XRF, a device used by scientists to measure elements in soil. At the corner of the playground, the XRF showed lead in soil just under the cable at 850 parts per million.

It doesn't take much lead in soil to elevate a blood level for a child, said Caravanos. "You just need a little dirt on your fingers to put into your mouth and ingest, and you get an elevated blood lead above the CDC level of 3.5."

In West Orange, N.J., a lead-sheathed cable sags over tree-lined sidewalks and driveways for more than one-third of a mile, where children and their parents walk, across the street from Gregory Elementary School. The cable sometimes dips to about 12 feet above the ground.

Caravanos found contaminated soil beneath the cable in multiple spots and registered multiple readings far exceeding the EPA guideline for play areas. Gregory Elementary School is one of 64 schools in New Jersey where the Journal identified aerial lead cables.

*       *       *

## FINGERPRINTING LEAD

At selected sites, the Journal took the extra step to confirm that lead stemmed from the cables and not another source. Reporters worked with a researcher to perform an isotopic analysis, a procedure that determines a specific fingerprint for the lead involved. The testing by Bruce Nelson, a geochemistry professor at the University of Washington who specializes in the field, linked the lead found in samples most likely to the specific cables—as opposed to, say, lead from a factory or from paint.

*       *       *

At some cable sites, telecom companies disavowed ownership. In Lake Pend Oreille in the Idaho panhandle, a snarl of two lead-covered cables lies abandoned at a spot where children speed by on inner tubes in the summer. The cables sit under a railroad bridge in a prime fishing spot.

A sample of water collected in August at the lake bottom showed lead at 1,250 parts per billion. A water sample taken at the surface in that spot showed lead at 38.8 parts per billion. An isotopic analysis showed that the fingerprint of the lead in the water at the surface matched lead from a telecom cable at that site, and not that of a lakeside slag heap known as Black Rock, the detritus of a lead smelter that had ceased operations by 1913.

A predecessor company to Verizon laid a cable near the site, a U.S. Army Corps record shows. Verizon, Frontier Communications and Ziply Fiber, telecom companies that have variously served this region over the years, say they don't own the cables.

## COAL COUNTRY RISK

*In Coal Center, Pa., an aerial lead-sheathed cable runs along the street, drooping so low in certain spots that it is nearly within arm's reach. The roughly mile-long cable, from Verizon, runs into neighboring California, Pa., across an entrance to apartment buildings, and near a school bus stop and playground. Some local residents had known about the cable and had been voicing their concerns for nearly a year.*

*Lead found at one of the locations measured 7.5 times the amount the EPA says is safe for play areas, according to a soil sample collected by the Journal. The isotopic analysis by Nelson showed the lead in the soil mirrored the lead from the cable and was unlike the background lead in that area.*

The lead-sheathed cable runs over the property of Shannon Bibby, 36, mother of the 6-year-old twins. This February, her children played under the cable in the lot next to their house, where ground was being dug up for the foundation of a home. *An analysis of soil collected by the Journal from the family's property showed*

*lead at a level more than 40% higher than the recommended level for play areas by the EPA.*

*A borough council member, Bibby had her children's blood tested after learning about the Journal's finding. Capillary tests, or blood pricks, found lead in one child's blood higher than 3.5 micrograms per deciliter.* The other child hit that mark, which is the level at which the CDC recommends seeking medical or environmental follow-up. A subsequent blood test showed non-detectable levels of lead.

It is impossible to say if the twins' initial elevated lead level tests were directly linked to exposure from the cable. The Bibbys' results were below what the EPA model could expect to find in a child playing in soil with the concentrations found at their property, according to Caravanos.

*Bibby said she and other Coal Center residents have been pushing Verizon to take the cable down. Verizon has told them it has working services on the old lead cable. In December, she and other Coal Center borough council members discussed their concerns in the tiny borough hall at the edge of the Monongahela River.*

*"We have to get moving on these cables," said council member Rob Lincavage, who grew up in Coal Center and said it has become one of his goals in life to see the cable removed.*

*"It shouldn't be here," said Bibby. She said the lead should be removed "before something bad happens."*

92.    On July 12, 2023, the WSJ published another article entitled "What AT&T and Verizon knew about toxic lead cables." The article discussed Verizon's knowledge about the potential health risks arising from the toxic lead cables in the ground and how employees showed higher concentrations of lead in their blood. The article reprimanded Verizon for failing to take responsibility for their pipes, quoting a doctor as saying that there was no amount of lead that was safe. The article stated in part:

*…For decades, AT&T, Verizon and other firms dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.*

They knew their employees working with lead regularly had high amounts of the metal in their blood, studies from the 1970s and '80s show. Environmental

records from an AT&T smelting unit in the 1980s show contamination in the soil. Government agencies have conducted inspections, prompted by worker complaints, that led to citations for violations involving lead exposure and other hazardous materials more than a dozen times over four decades, records show.

\*         \*         \*

Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead. The telecom industry's lead-covered cables have been largely unknown to the public. The industry doesn't have a program to remove or assess their condition. Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.

\*         \*         \*

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

The cables were laid by the original American Telephone & Telegraph, also known as the Bell System, which operated as a group of regional telephone companies starting in the late 1800s. With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon.

\*         \*         \*

*Between 2007 and 2016, blood-lead test results for 208 Verizon workers showed that 85, or more than 40%, had levels above 3.5 micrograms per deciliter, according to Verizon data shared with the union. That's the current level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up.*

*Rob Prokopowicz, who retired from Verizon in 2021 after 40 years of working with lead, said he raised concerns with managers about routinely pumping out water from manholes that was potentially contaminated with lead, including in front of schools. He said they told him, "If you don't feel safe, we'll send someone else."*

*"When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust," said Prokopowicz, 62.*

38

"For the small percentage of our workforce that may need to work around lead-sheathed cable, we have a robust safety and health program to provide training, materials and resources needed to do so safely," a Verizon spokesman said. The company said its work practices on such cables are based on the available science, legal requirements and guidance from medical and work-safety organizations.

"Verizon's long standing policy allows for any employee who requests to be tested for lead exposure to do so at any time and without any cost to the employee," he said.

*A study last year at Mount Sinai of 20 Verizon workers, with an average tenure of 23 years, showed that 60% had measurable lead in their tibias, said Dr. Rabeea Khan, the study's principal investigator. "The fact that we can detect it in your bones suggests you have had long-term exposure," she said.*

Nearly half of the workers in the study, mostly cable splicers, showed lead concentrations of 10 micrograms per gram of bone, indicating increased risk of neurological or biological problems, Khan said. Mount Sinai is planning a broader study later this year.

93.    This was followed, on July 14, 2023, by another WSJ article entitled "I Was Really Sick, and I Didn't Know From What." The article profiled Verizon employees who, along with their families, suffered chronic health issues as a result of exposure to Verizon's toxic cables. The article stated, in pertinent part:

Tracy Fitchhorn worked with lead solder. Her husband, Dan Fitchhorn, spliced lead cables. Her father, Peter Hopkins, handled lead as an installer and repairman. All worked for decades for telecom companies. All are now sick.

The Fitchhorns, like tens of thousands of workers at American Telephone & Telegraph and its successor companies, were exposed to lead on the job over many years. Current and former workers say they often felt left in the dark about their exposure and how to stay safe.

Some of the workers have neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure. There's no way to determine what triggered specific ailments. Doctors say no amount of lead is safe.

*The lead, which those workers handled for decades, is a potential health risk for communities across the U.S. The cables sheathed in the toxic metal are the subject of a Wall Street Journal investigation that has detailed how AT&T, Verizon and other telecom giants left behind a sprawling network of cables,*

39

*many of which are leaching lead into the environment. Children are especially vulnerable to the effects of lead exposure.*

AT&T dismissed "anecdotal, non-evidence-based linkages to individuals' health symptoms," saying those symptoms "could be associated with a vast number of potential causes." Verizon said it has "a robust safety and health program to provide training, materials and resources," and that workers can get lead testing at any time at no cost.

*Current and former workers described scant precautions. Many said they learned how to handle lead on the job and weren't given respirators or regular blood lead tests.*

Over decades, they wiped hot lead solder to repair cables in New York, fixed aerial lead cables in Pottsville, Pa., and used shaving cream to contain manhole lead dust in Portland, Ore. James Innes said his taste changed, which can be a sign of lead exposure.

The old Bell System of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers. They kept detailed medical records. AT&T declined to provide anonymized blood-lead testing data about employees and retirees, including from its archives.

*A study conducted in the 1970s at New York's Mount Sinai hospital of 90 Bell System cable splicers showed "a high lead content in their blood," with 10 "in danger of suffering medical and/or physical deterioration if they continue on their jobs," according to letters among union officials. A small study last year of lead in Verizon workers' bones showed that exposures continued.*
AT&T and Verizon declined to comment on the studies.

Tommy Steed removed lead underground cables in the Bronx in the 1980s and said he often vomited after eating breakfast. He said he never got his blood test results from Nynex, now part of Verizon, despite repeated requests. The state health department later provided them, showing high levels of lead. Nynex "didn't try to get me any remedial help," said Steed, now chairman of the Association of BellTel Retirees, which advocates for former workers.

94.      This article profiled James Innes, a former cable splicer for, among other companies, Verizon. Mr. Innes was reported as having "[d]ecades of gastrointestinal problems," and was quoted as saying ***"[y]ou were creating a kind of powder from shaving the lead sheath, and every now and then you'd get a sweet taste in your mouth from inhaling the lead."***

95.    The article also profiled Tim Killeen, a former cable splicer for, among other companies, Verizon. Mr. Killeen has "chronic headaches, memory loss and difficulty breathing. His first wife had two miscarriages. His daughter suffered from childhood heart problems and has been diagnosed with ADHD. Those conditions can be linked to lead exposure."

96.    On July 17, 2023, the WSJ published the article titled "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables." This article further elaborated upon the need for the EPA's involvement, stating:

> Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.
>
> In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.
>
> A Wall Street Journal investigation revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing showed that dozens of spots registered lead levels exceeding EPA safety guidelines.
>
> "Without EPA intervention, we expect that the risk posed by the cables will increase as they further deteriorate and release lead into the environment," according to the letter by the three nonprofit organizations, the Environmental Defense Fund, Clean Water Action and Below the Blue.
>
> The Journal used testing including isotopic analyses and control sampling to confirm that the contaminating lead in some locations most likely came from the cables. Below the Blue's co-founders, who also work at Marine Taxonomic Services, helped the Journal with environmental sampling for its investigation. The Environmental Defense Fund provided guidance and $85,000 to Marine Taxonomic Services to partly fund its field research for the project.
>
> The EPA and its administrator, Michael S. Regan, didn't immediately respond to a request for comment.
>
> The Journal found lead leaching into soil directly underneath aerial lead cables, according to test results by independent accredited laboratories. The Journal

41

identified about 250 aerial lead cables alongside streets and fields next to schools and bus stops. There are likely far more throughout the country.

"If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed, and taken out of service as soon as possible, followed by removal," according to the letter, which was viewed by the Journal. "EPA should also ensure surface soil contaminated by the aerial cables is removed or permanently covered."

Roughly 330 underwater cable locations identified by the Journal are in a "source water protection area," according to an EPA review performed for the Journal.

The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead. They declined to provide a full accounting of the number of lead cables in their networks to the Journal. They said they would work together to address any concerns related to lead cables.

Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases. The Safe Drinking Water Act allows the agency to take actions to protect health when informed of a contaminant "which is present in or is likely to enter a public water system or an underground source of drinking water" and may present "an imminent and substantial endangerment" to health.

Lead from cables and from junction boxes where cables are spliced is "accessible to the public from the ground with many near playgrounds, schools, child-care facilities, and greenways where inquisitive children may be exposed," the letter said.

Following the Journal investigation, a Wall Street analyst estimated it could cost $59 billion to remove all the lead cables nationwide.

Noting the EPA's limited resources, the groups urged the agency to tap telecom companies responsible for the most lead cables "to support the assessment and actions needed to protect the public from potential exposure."

In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables. In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.

"Does the EPA plan on compelling clean up action from these telecom companies?" Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water.

Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC [Federal Communications Commission] on this so we are happy to follow up in the coming weeks."

97.     On July 26, 2023, the WSJ published an article titled "Justice Department and EPA Probe Telecom Companies Over Lead Cables." Which detailed the possible responses that the EPA might have to these issues, and included asking the company to fund the costs of removal in addition to possible fines, stating in part:

> The Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead-sheathed telecom cables across the U.S.
>
> The Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with the inquiry.
>
> The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed
>
> AT&T… and Verizon Communications … to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days. Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.
>
> A Wall Street Journal investigation recently revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines.
>
> The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement.

*        *        *

43

Verizon said it hasn't been contacted by the Justice Department. A Verizon spokesman said: "As we have said from the beginning, we remain committed to the factual and scientific based analysis of the issues. We will continue to have a proactive and constructive dialogue with the EPA as we jointly work to better understand the facts and consider any potential actions."

*        *        *

The EPA sought data from Verizon on three lead-sheathed cable sites, and said it would begin independent sampling in Coal Center, Pa., and West Orange, N.J., and coordinate with New York state to review samples in Wappingers Falls, N.Y., all locations cited in the Journal articles.

The EPA said a priority would be "evaluating areas with vulnerable communities and sites closely linked with children, such as schools and playgrounds." The EPA said its Office of Land and Emergency Management and regional offices are coordinating with state environmental agencies to assess potential contamination at the sites identified by the Journal.

*        *        *

On Tuesday, Verizon Chief Financial Officer Tony Skiadas said in an earnings call that "it's far too soon" to project the financial impact that aging lead-sheathed cables might have on the telecom giant. Verizon said lead-clad cable makes up a small percentage of the less than 540,000 miles of cables in its copper-wire network, though that accounting excludes two previously acquired companies with records the company is still reviewing.

Wall Street research analysts have estimated that lead cables make up roughly 15% to 20% of Verizon's legacy footprint, totaling at least 81,000 miles of lead. Last week, Gov. Kathy Hochul directed three state departments to "immediately investigate" lead cabling in New York, directing telecom providers to provide an inventory of all lead cable locations in the state. Hochul also directed state inspectors to conduct sampling for lead in the Wappingers Falls playground where a lead cable and contamination were identified by the Journal.

"We will hold the telecommunication companies responsible and take swift action to remediate any problems," Hochul said in a statement.

Rep. Pat Ryan, a New York Democrat, wrote to Verizon, AT&T and USTelecom demanding they remove the lead cables. He also asked the companies how many miles of lead-sheathed cables they are responsible for, and about any plans to protect workers, provide access to blood and bone testing for lead, and remediate any risk.

The Manhattan U.S. attorney's office in recent years has brought a series of civil cases related to alleged environmental wrongdoing. In 2021, the office announced

a settlement with Toyota Motor, in which the company paid a $180 million civil penalty for failing to comply with Clean Air Act reporting requirements. The company acknowledged that for a decade it either failed to file required emissions reports or filed them late.

98.     The Board's failure to implement processes to oversee Verizon's response to these issues, like the Board's failure to require a study, failure to make the issue a recurring board agenda item, failure to create a dedicated internal committee, or failure to assign management to address these issues, has exposed the Company to a material risk of substantially higher costs to remediate, increased government intervention and regulation, more negative media attention, and a risk that cables will have to be taken off line if federal, state, and local governments mandate immediate remediation.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and violations of the federal securities laws by the Individual Defendants.

100.     Verizon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

101.     Plaintiff is an owner of Verizon common stock and has been a continuous Verizon shareholder at all relevant times.

102.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

103.     A pre-suit demand on the Board of Verizon is futile and, therefore, excused. At the time this action was commenced, the Board consists of the following twelve individuals:

Defendants Vestberg, Otis, Archambeau, Austin, Bertolini, Colao, Healey, Narasimhan, Schulman, Slater, Tomé, and Weaver (the "Director Defendants"). Plaintiff only needs to allege demand futility as to six of the twelve Board members.

104.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause Verizon to make false and misleading statements and omissions of material fact. Each Director Defendant signed at least one of Verizon's false and misleading annual reports on Form 10-K with the SEC. Thus, the Director Defendants are unable to investigate the charges impartially and decide whether to pursue action against themselves and the other perpetrators of the scheme.

105.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director Defendants caused Verizon to issue false and misleading statements which were intended to make Verizon appear more profitable and attractive to investors. Moreover, the Director Defendants caused Verizon to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

106.    The Director Defendants were responsible for reviewing and approving Verizon's public statements at all relevant times. By authorizing the false and misleading statements and material omissions described above concerning Verizon's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

107.     Additional reasons that demand on Defendant Vestberg is futile follow. Vestberg is Verizon's CEO and has been in this role since August 2018. Defendant Vestberg is also the Chairman of the Board. In his positions at Verizon, the Company provides Defendant Vestberg with significant compensation. As CEO, he is ultimately responsible for all of Verizon's false and misleading statements and omissions made at all relevant times. Further, Defendant Vestberg is a defendant in the Securities Class Action. The Company's 2023 Proxy Statement admits that Defendant Vestberg is not an independent director.

108.     Additional reasons that demand on Defendant Otis is futile follow. Defendant Otis has served as a director of the Company since 2006. Defendant Otis has received and continues to receive significant compensation for his role as a director as detailed above.  As an Audit Committee member, Otis was specifically entrusted with assisting the Board in overseeing Verizon's public disclosures, compliance with the Audit Committee charter, and is liable for any violations thereof. Otis, as a director and member of the Audit Committee, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Otis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109.     Additional reasons that demand on Defendant Archambeau is futile follow. Defendant Archambeau has served as a director of the Company since 2013. Defendant Archambeau has received and continues to receive significant compensation for her role as a director as detailed above. As an Audit Committee member, Archambeau was specifically entrusted with assisting the Board in overseeing Verizon's public disclosures, compliance with the Audit Committee charter, and liable for any violations thereof. Archambeau, as a director

and member of the Audit Committee, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Archambeau breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Austin is futile follow. Defendant Austin has served as a director of the Company since 2020. Defendant Austin has received and continues to receive significant compensation for her role as a director as detailed above. As an Audit Committee member, Austin was specifically entrusted with assisting the Board in overseeing Verizon's public disclosures, compliance with the Audit Committee charter, and liable for any violations thereof. Austin, as a director and member of the Audit Committee, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Austin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant Bertolini is futile follow. Defendant Bertolini has served as a director of the Company since 2015. Defendant Bertolini has received and continues to receive significant compensation for his role as a director as detailed above. Bertolini, as a director, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded his duty to protect corporate assets. For these reasons, Defendant Bertolini breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Colao is futile follow. Defendant Colao has served as a director of the Company since 2022. Defendant Colao has received and continues to receive significant compensation for his role as a director as detailed above. Colao, as a director, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Colao breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Healey is futile follow. Defendant Healey has served as a director of the Company since 2011. Defendant Healey has received and continues to receive significant compensation for her role as a director as detailed above. Healey, as a director, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Healey breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

114.    Additional reasons that demand on Defendant Narasimhan is futile follow. Defendant Narasimhan has served as a director of the Company since 2021. Defendant Narasimhan has received and continues to receive significant compensation for his role as a

director as detailed above. As an Audit Committee member, Narasimhan was specifically entrusted with assisting the Board in overseeing Verizon's public disclosures, compliance with the Audit Committee charter, and is liable for any violations thereof. Narasimhan, as a director and member of the Audit Committee, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Narasimhan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

115.    Additional reasons that demand on Defendant Schulman is futile follow. Defendant Schulman has served as a director of the Company since 2018. Defendant Schulman has received and continues to receive significant compensation for his role as a director as detailed above. Schulman, as a director, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Schulman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.    Additional reasons that demand on Defendant Slater is futile follow. Defendant Slater has served as a director of the Company since 2010. Defendant Slater has received and continues to receive significant compensation for his role as a director as detailed above. Slater, as a director, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect

corporate assets. For these reasons, Defendant Slater breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Tomé is futile follow. Defendant Tomé has served as a director of the Company in 2020 and since 2021. Defendant Tomé has received and continues to receive significant compensation for her role as a director as detailed above. Tomé, as a director, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Tomé breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

118.    Additional reasons that demand on Defendant Weaver is futile follow. Defendant Weaver has served as a director of the Company since 2015. Defendant Weaver has received and continues to receive significant compensation for his role as a director as detailed above.  As an Audit Committee member, Weaver was specifically entrusted with assisting the Board in overseeing Verizon's public disclosures, compliance with the Audit Committee charter, and liable for any violations thereof. Weaver, as a director and member of the Audit Committee, conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Weaver breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause Verizon to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

120.    Verizon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Verizon any part of the damages Verizon suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

121.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

122.    The acts complained of herein constitute violations of fiduciary duties owed by Verizon's officers and directors, and these acts are incapable of ratification.

123.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Verizon. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Verizon, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

124.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Verizon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

## **FIRST CLAIM**

**Against the Individual Defendants for Violations of § Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9)**

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

127.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

128.    Under the direction and watch of the Individual Defendants, the 2021 Proxy Statement, the 2022 Proxy Statement, and the 2023 Proxy Statement (collectively, the "Proxy Statements") failed to disclose the known damage caused by the legacy copper cables Verizon abandoned as they were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Verizon employees, and the public

129.    The Proxy Statements further failed to disclose that the Company was violating federal law, issuing false and misleading statements in violation of securities laws, and had failed to establish or maintain adequate internal controls. As a result, the Proxy Statements were materially false and misleading.

130.    In the exercise of reasonable care, these defendants should have known that the statements contained in the Proxy Statements were materially false and misleading.

131.    The misrepresentations and omissions in the Proxy Statements were material to Company stockholders in voting on the Proxy Statements. The misrepresentations and omissions were material to Company stockholders in voting on the matters set forth for stockholder determination in the Proxy, including but not limited to the reelection of certain Defendants and the approval, on an advisory basis, of the compensation of the Company's executives.  The Proxy Statements were essential links in defendants' insulation of the awards from stockholder challenge.

132.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the Proxy Statements.

133.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

### SECOND CLAIM

**Against Defendants Vestberg and Ellis for Contribution
Under §10(b) and §21D of the Exchange Act**

134.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

135.    Verizon and Defendants Vestberg and Ellis are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Vestberg's and Ellis' willful and/or reckless violations of their obligations as controlling shareholder, officers and/or directors of Verizon.

136.    Defendants Vestberg and Ellis, because of their positions of control and authority as controlling shareholder, officers and/or directors of Verizon, were able to and did, directly

and/or indirectly, exercise control over the business and corporate affairs of Verizon, including the wrongful acts complained of herein and in the Securities Class Action.

137.    Accordingly, Defendants Vestberg and Ellis are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

138.    As such, Verizon is entitled to receive all appropriate contribution or indemnification from Defendants Vestberg and Ellis.

## **THIRD CLAIM**

### Against the Individual Defendants for Violations of § 10(b)
### of the Exchange Act and Rule 10b-5

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

141.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

142.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

143.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Verizon were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

144.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Verizon, their control over, and/or receipt and/or modification of Verizon's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Verizon, participated in the fraudulent scheme alleged herein.

145.    As a result of the foregoing, the market price of Verizon common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Verizon common stock in purchasing Verizon common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

148.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

149.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150.    Specifically, the Individual Defendants made, or caused Verizon to make, false and misleading statements and failed to disclose that: (1) Verizon had abandoned and was responsible for highly toxic cables which were wrapped in lead, a known neurotoxin, that harmed and posed the risk of further harming the environment, Verizon employees, and the general public; (2) Verizon's ownership of these cables, and failure to disclose their ownership of these cables to employees and the public likely to be harmed, constituted a threat to Verizon's reputation and its ability to create business value by earning the trust of its customers, employees, and shareholders; (3) Verizon faces potentially significant litigation risk, regulatory risk, and reputational harm as a result of its responsibility for these lead-covered cables and the health risks and environmental damage stemming from their presence around the country; (4)

Verizon was warned about the damage and risks the lead-wrapped cables presented, but did not disclose the potential threat to Verizon's employees or to the general public; and (5) as a result, the Individual Defendants' statements about Verizon's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis in fact at all relevant times.

151.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

152.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

153.    Plaintiff, on behalf of Verizon, has no adequate remedy at law.

### FIFTH CLAIM

**Against the Individual Defendants for Unjust Enrichment**

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Verizon.

155.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Verizon that were

tied to the performance or artificially inflated valuation of Verizon, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

156.    Plaintiff, as a shareholder and a representative of Verizon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

157.    Plaintiff on behalf of Verizon has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

158.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

159.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

160.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

161.    Plaintiff on behalf Verizon has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

162.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

163.    The Individual Defendants, either directly or through aiding and abetting, failed to reasonably exercise their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the expectations and operations of a publicly held corporation

164.    As a direct and proximate result of the Individual Defendants' gross mismanagement alleged herein, the Company has sustained and will continue to sustain substantial damages.

165.    Plaintiff on behalf of Verizon has no adequate remedy at law.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: January 9, 2024

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: estone@rosenlegal.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Gerry Gabel am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed this  12/21/2023

Gerry Gabel